Estate of Joseph E. Goar, deceased, Leona M. Goar, former administratrix, and Leona M. Goar and Clayton E. Goar, sole beneficiaries v. Commissioner. Leona M. Goar, Transferee of the Estate of Joseph E. Goar, deceased v. Commissioner. Clayton E. Goar, Transferee of the Estate of Joseph E. Goar, deceased v. Commissioner.
Estate of Joseph E. Goar v. Commissioner
Docket Nos. 21836, 21837, 21838.
United States Tax Court
1950 Tax Ct. Memo LEXIS 95; 9 T.C.M. (CCH) 854; T.C.M. (RIA) 50242; September 21, 1950
Robert S. Eastin, Esq., 1000 Federal Reserve Bank Bldg., Kansas City 6, Mo., and M. D. Blackwell, Esq., for the petitioners. William B. Springer, Esq., for the respondent. DISNEY
Memorandum Findings of Fact and Opinion DISNEY, Judge: These proceedings, consolidated for hearing, involve deficiencies in estate tax in the amount of $111,686.25. In Docket Nos. 21837 and 21838 the question is one of transferee liability. The questions for our determination are: (1) Whether certain property transferred in trust by the decedent, Joseph E. Goar, *96 under two written trust agreements dated October 30, 1935, is includible in the gross estate of the decedent. (2) If the 100 shares of The Goar Corporation stock transferred in trust on October 30, 1935, are includible in the gross estate, what was the fair market value per share at the date of the decedent's death? (3) Did the respondent err in disallowing $1,227.77 of the amount of $2,027.77 claimed as a deduction in the Federal estate tax return for support of dependents? (4) Are Leona M. Goar and Clayton E. Goar, widow and son of decedent, liable as transferees for a part or all of the estate taxes finally determined to be due from the estate? The cases were submitted on a stipulation of facts, oral and documentary evidence. The stipulation is adopted and incorporated in our findings. The facts as stipulated are so found. Such part thereof as it is considered necessary to set forth is included with other facts found from the evidence adduced in our Findings of Fact Joseph E. Goar, decedent herein, was born December 3, 1876, and died testate on February 13, 1947, a resident of Johnson County, Kansas. His death was caused by coronary thrombosis. He had been suffering from a *97 heart condition (angina pectoris), the symptoms of which had been in existence for about two weeks prior to his death. He was survived by his widow, Leona M. Goar, who was born March 18, 1879, and their son, Clayton E. Goar, who was born May 25, 1904. At the time of the hearing of this case Clayton had three children who were born October 9, 1935, October 19, 1937, and April 5, 1946. Administration of decedent's estate was had in the Probate Court of Johnson County, Kansas. Leona was appointed administratrix with the will annexed. The administration of the estate was closed on or about April 6, 1948, and on or about that time the assets so administered were distributed to Leona and Clayton in equal parts pursuant to the court's order and following the election of the widow to take at law. An estate tax return for the estate of the decedent was filed on July 11, 1947, with the collector of internal revenue for the district of Kansas. No election was made in the return to have the gross estate valued in accordance with values as of a date or dates subsequent to the decedent's death. In the return a gross estate of $104,430.33, total deductions of $13,099.26, and a total tax of $3,239.59 *98 were reported. On September 5, 1930, the decedent made, published and declared his last will and testament. In that will he devised and bequeathed all personal and real property to his wife, Leona, provided that if she should not survive him then all his property was to go to his son Clayton. Under date of October 30, 1935, the decedent as grantor and trustee executed two trust instruments. One instrument named Clayton and the other named Leona as the primary beneficiary. In each instrument the decedent was designated the trustee. The agreement in which Clayton was named primary beneficiary provides, in part, as follows: That the grantor should be trustee for the benefit of his son, Clayton Goar; that the trust is to carry out a plan that the grantor had long had under consideration to make the beneficiary secure against the contingencies of life; that the trustee is authorized to hold, manage and deal with the property in his uncontrolled discretion and out of the net income of the trust estate or, if the income is not sufficient, out of the principal, to pay the premiums on any life insurance, endowment or annuity issued or held by the trustee and if any income remains it shall *99 be paid to the beneficiary in monthly installments; that at the death of the beneficiary the trustee shall divide the trust estate (except the amount invested in life insurance, endowment or annuity contracts in which contingent beneficiaries have been named) in equal parts for each child or adopted child surviving the beneficiary and the child of any deceased child or adopted child; that no person entitled to income shall have the power of anticipation, alienation or assignment; that in the event of the death of the trustee, Leona M. Goar shall be successor trustee unless the grantor names some other person in writing and the successor shall have the same rights as trustee, as given the grantor; that the trust is irrevocable, not subject to alteration or amendment, except as expressly provided; and that the grantor does not reserve any rights in the income or principal of the trust estate. Attached to the trust instrument is a schedule of 13 life insurance policies, and 100 shares of the corporate stock of The Goar Corporation, placed in trust under the terms of the trust agreement. Of the policies, three were issued by the Kansas City Life Insurance Company, two by the Equitable *100 Life Insurance Company of Iowa, four by the Sun Life Assurance Company of Canada, two by the Prudential Insurance Company of America, and two by the Lincoln National Life Insurance Company. The agreement creating the trust for Leona reads the same as the agreement creating the trust for Clayton except that in the former Leona is named as primary beneficiary. It also provides that in the event no child or adopted child or descendant of a deceased child shall survive Leona the trust property shall be added to the trust created for the benefit of Clayton; Clayton is named successor trustee; and the schedule of property does not include the two Lincoln National Life Insurance Company policies included in the schedule attached to the agreement creating the trust for Clayton. On October 30, 1935, the decedent's age was 58 years, 10 months and 27 days. He was in good health and not under the care of any physician. The decedent owned about $15,000 in Government bonds, $51,000 face amount in life insurance, in addition to the life insurance policies transferred in trust (a $10,000 policy, included in the $51,000, was cashed in some time between October 30, 1935, and the date of the decedent's *101 death; the remaining amount of the $51,000 was reported in Schedule D of the decedent's estate tax return), and maintained a bank balance in a checking account of about $6,500. He and his wife owned jointly their home which was purchased in 1934 for $20,000, and on which was spent some $10,000 to $12,000 in improvements. The primary reasons and motives for the transfers to the trusts on October 30, 1935, were to avoid probate court difficulties with decedent's estate in the event of his death, and decedent believed he should do something to protect his wife and Clayton, and he wanted to set up some kind of trust so that in the event of his death his wife and Clayton would be protected. On or about March 15, 1936, the decedent filed a gift tax return whereby he reported as gifts the assets covered by the trust agreements executed October 30, 1935. A gift tax was paid thereon at the time of filing of the return. Upon audit a deficiency of $6,696.19 was agreed to and paid, making a total gift tax paid of $15,396.80. As adjusted for gift tax purposes the insurance policies were valued as $88,813.43 and the 100 shares of stock of The Goar Corporation at $189,493.22. The decedent acted *102 as sole trustee to the trusts until his death. In Schedule G of the estate tax return, transfers to the trusts were mentioned but no part of the value of the trust assets was included in the gross estate as returned. The respondent has included the insurance policies in the gross estate at a value of $128,522.01. The respondent has included the 100 shares of The Goar Corporation stock in the gross estate at a value of $289,717. For many years prior to 1935 decedent had been associated with P. Steven Harris in a business known as Harris-Goar Company which engaged in selling men's and women's clothing, shoes, jewelry and household appliances. Since April 1928 Harris-Goar Company had been a corporation. In 1935 the stock of the corporation was owned 25 per cent by decedent, 25 per cent by his wife, 25 per cent by Harris, and 25 per cent by Harris' wife. The net sales and net earnings of the Harris-Goar Company before taxes for the years 1935 and 1936 are as follows: Net earnings
before taxes
(installment
Year
Net sales
basis)
1935
$568,980.80
$18,247.44
1936
453,467.57
22,152.41
In 1929 the Harris-Goar Company operated ten stores, but by *103 1935 that number had been reduced to three stores. The net worth of the company on December 31, 1934 and December 31, 1935, was as follows: One-fourth of
Date
Net worth
the net worth
12-31-34
$268,563.99
$67,141.00
12-31-35
284,302.41
71,075.60
The corporation went out of business in 1945 and 1946. All the insurance policies were taken out by decedent on his life. At the time the policies were issued Leona was named death beneficiary in all of the policies except in the two Lincoln National Life Insurance Company policies (successor to Peerless Life Insurance Company) in which Clayton was named beneficiary. All policies provided that if no beneficiary was living at the death of the insured the proceeds should be paid to the executors, administrators, or assigns of the insured. The insured had the right under all policies to change the beneficiaries, borrow on the policy, surrender the policy, and assign the policy. The four Sun Life policies, in addition to death benefits, provided for annuities to be paid to Leona during the life of the insured (designated the annuitant), and in the event of her death to the insured. By endorsements, dated October 29, 1935, the *104 three policies issued by the Kansas City Life were made payable to Leona on the death of the insured in 240 certain monthly installments or for her life, and if Leona should predecease the insured or if she should survive him but die before having received all of the 240 monthly installments, it was provided that the monthly installments, certain falling due after her death should be paid to Clayton. The endorsements also contained a provision that the beneficiaries should not have the right to assign, commute, or anticipate any of the payments except as expressly stipulated. Each of the Sun Life policies contains a "Request for Change" signed by the insured and dated October 30, 1935, which reads, in part, as follows: That decedent requests if the four policies, or any of them, become claims by reason of the death of the annuitant, the proceeds shall be converted in accordance with Option 3 in installments provided in the policies and be paid monthly to Leona Goar, for 240 months and as long as she survives; that if she died before the 240 months and survived the annuitant the proceeds of the remaining installments be paid to Clayton Goar; that if she predeceased the annuitant, *105 then on the death of the annuitant, the proceeds should be paid under Option 3 monthly to Clayton Goar for 240 months or as long as he survivies; that if the survivor of Leona and Clayton survive the annuitant but die while entitled to receive payment under Option 3, the commuted value of the remaining installments shall be paid to the executors or administrators of the annuitant, and if both Leona and Clayton predecease the annuitant, the proceeds shall be paid to his executors, administrators or assigns; that the rights of Leona and Clayton can not be encumbered, alienated or assigned and that neither can anticipate or commute installments payable under Option 3 and that such rights shall be exempt from claims of creditors; and that the decedent reserves the right to revoke the provisions as to the disposition of the proceeds, to elect any other method of payment provided for in the policies and to receive and enjoy every benefit conferred by the policies. Settlement provisions similar to those contained in the Sun Life policies are contained in the two Equitable Life policies pursuant to request by the insured dated October 30, 1935, and in the two Prudential policies pursuant *106 to requests by the insured dated October 17, 1935. Under date of October 18, 1935, the insured elected a mode of settlement under the two Lincoln National Life policies similar to that contained in the Sun Life policies, except that Clayton was named the primary beneficiary and Leona the contingent beneficiary. Attached to Sun Life policy number 100395 is an assignment by Joseph Elmer Goar to Joseph Elmer Goar, Trustee, under the agreement of October 30, 1935, assigning to him all rights under the policy, including dividends, dividends additions or accumulations; and stating that unless changed by the trustee prior to maturity, the policy shall be payable as provided in the settlement provisions of October 30, 1935. Similar assignments were attached to all the policies. Some were dated October 31, 1935, and others on November 1, 1935. On October 30, 1935, policies numbered 51925 and 494612 of Kansas City Life and all policies of Sun Life were paid up. Payment of the premiums on the policies, after October 30, 1935, and to the date of decedent's death were made as follows: In the amount of $5,689.68 by decedent personally by his own personal checks; in the amount of $6,299.19 *107 by Goar Corporation checks charged to Leona Goar's personal account on Goar Corporation books; and by J. E. Goar, Trustee, in 1936 in the amount of $207.95 on Kansas City Life policy number 242069 and $40.34 on the Equitable Life of Iowa policy number 24747. In addition, for the year 1940, $78.48 was paid on Peerless Lincoln National policy number 1050 by a payor unknown and for 1942, $207.95 was paid on the Kansas City Life policy number 242069 by a payor unknown; and the amounts and payor of the payments for 1938 and 1939 on Prudential policies numbers 3935383-4 are unknown. The Goar Corporation is a personal holding corporation organized about 1932 under the laws of Missouri. From the date of incorporation to the date of decedent's death, The Goar Corporation had issued and outstanding 250 shares of common stock. Up to the date of the creation of the trusts of October 30, 1935, the stock was held as follows: Joseph E. Goar, 100 shares; Leona Goar, 100 shares; Clayton Goar, 50 shares. After the trusts were set up Leona and Clayton continued to hold the same number of shares up to the date of decedent's death. Up to the date of his death decedent always managed the business of *108 The Goar Corporation. Clayton and Leona did discuss investments with decedent. When stocks and bonds were purchased for The Goar Corporation they were purchased in the name of decedent. There were no separate books kept for the trusts. An account was carried on the books of The Goar Corporation for the years 1936 through 1943 under the heading "J. E. Goar, Trustee." The account showed crediting as of December 31 each year of income consisting of dividends from The Goar Corporation and income from the Sun Life Insurance Company. On The Goar Corporation books were two accounts for the years 1937 through 1942 entitled "J. E. Goar, Trustee for C. E. Goar" and J. E. Goar, Trustee for L. M. Goar." One-half of the income from the "J. E. Goar, Trustee"account was credited as of December 31 of each year to each of those accounts. That income in turn was credited to personal accounts of Leona and Clayton on the books of The Goar Corporation. In August 1943 a revenue agent began an examination of the income tax returns of decedent and the returns of the trusts of October 30, 1935, for the years 1938, 1939, 1940 and 1941. He concluded that the income of the trusts was taxable to decedent. *109 Decedent did not protest the findings. The income of the trusts for subsequent years at least up to the date of decedent's death was taxed to decedent. For the years 1944, 1945 and 1946 the income from the trusts was credited to the account of decedent on the books of The Goar Corporation. After decedent's death Clayton was advised by an attorney that the trust income should not have been credited to decedent. After decedent's death, entries were made on The Goar Corporation books debiting J. E. Goar, personal, $49,078.29 and crediting C. E. Goar, $24,539.15 and L. M. Goar, $24,539.14, with the notation, "Income from the Goar trust for the years 1944, 1945 and 1946 credited to J. E. Goar when same should have been credited to the accounts of C. E. Goar and L. M. Goar." At the date of death of decedent, the assets of The Goar Corporation consisted of cash in the amount of $156,787.46, accounts receivable in the amount of $415, other assets of $3.00, and stocks and bonds. The stocks and bonds were all listed or sold over the counter except 100 shares of common stock of Hargo Realty Company which had a value of $22,500 on the date of decedent's death and 500 shares of Lucky Tiger Manufacturing *110 Company common stock. The value of all of the assets of The Goar Corporation except said 500 shares of stock of Lucky Tiger Manufacturing Company on the date of decedent's death was $583,941.91. On said date The Goar Corporation had liabilities (other than capital stock and surplus) of $84,603.25. Those liabilities represented dividends not withdrawn from personal accounts by stockholders. At October 30, 1935, the assets of The Goar Corporation consisted of the same general kind and type of property as on the date of decedent's death. The Lucky Tiger Manufacturing Company is a corporation incorporated under the laws of the State of Missouri in August 1917 with offices in Kansas City, Missouri. The capital stock of Lucky Tiger has always been owned by the Goar and Harris interests. The 500 shares of Lucky Tiger stock owned by The Goar Corporation on the date of decedent's death represented one-third of the capital stock and the remaining two-thirds of the stock at that time was owned by the Harris interests. In 1935 The Goar Corporation owned one-third of the Lucky Tiger stock. At the time of the hearing of these proceedings there had never been any sales of Lucky Tiger stock. *111 From at least 1937 to 1944 when Clayton joined the Red Cross and went overseas he was a vice-president of Lucky Tiger and devoted only part time to the business. For some years prior to 1937 he had been an assistant secretary. On his return from overseas in July 1945 Clayton became an officer of Lucky Tiger and began devoting full time to the business. From at least 1935 to the date of his death decedent was an officer of Lucky Tiger, devoting part of his time to the business. In 1935 and 1937 through 1946, he received a salary from that company of $7,500 a year. Harris was active head of the business. The policies of the business were determined jointly by him and the decedent. Harris died June 21, 1944. Steven W. Harris, son of P. Steven Harris, was a Naval lieutenant in the last war. When he returned from the war in December 1945, he became president of Lucky Tiger and active in the business. He received a salary of $3,236.55 for 1945, $18,000 for 1946, and $15,000 for 1947. Prior to the war he was a director and stockholder, but otherwise was not active in the business. Since the first part of 1946 Clayton Goar and Steven W. Harris have been in active charge of the business. *112 Clayton received salaries of $10,721.52 for 1946 and $11,002 for 1947. In 1935 and at the date of decedent's death Lucky Tiger was engaged in the manufacture and sale of hair tonics, shampoos and related products. During the war Lucky Tiger was unable to procure castor oil for the manufacture of one of its principal products and discontinued such manufacture but resumed same after the war. During the war about half of Lucky Tiger's products were sold to the "Army Exchange Service and Ship's Stores." Otherwise, from 1937 through 1947 the products of Lucky Tiger were sold to wholesale druggists, barber and beauty supply dealers, chain stores, and independent druggists who could buy in lots of 100 pounds or more. At the time of decedent's death Lucky Tiger's accounts were numerous. The products are sold throughout the United States. Prior to the war Lucky Tiger had from 8 to 13 salesmen. During the war years its sales force was cut to two salesmen. During 1946 it hired about seven salesmen. Lucky Tiger's principal competitors are Wild Root Corporation, makers of Wild Root; Brystol-Myers, makers of Vitalis; and the Chesebrough Company, makers of Vaseline hair tonic. The total assets *113 owned by Lucky Tiger at the end of each of the years 1937 through 1947 were as follows: 1937
$198,029.43
1938
229,259.73
1939
200,979.10
1940
234,556.07
1941
304,113.90
1942
316,364.39
1943
400,610.09
1944
488,433.90
1945
556,650.59
1946
345,537.02
1947
316,201.02
Lucky Tiger's gross sales, advertising expense (as revealed on its tax returns), net earnings after Federal and state income taxes, dividends paid during the year, and the earned surplus and undivided profits at the end of each year 1937 to 1948 are as follows: Divi-
Paid Surplus and
Net Earnings
dends
Undivided Profits
Advertising
or (Loss)
Paid During
at the End
Year
Gross Sales
Expense
After Taxes
the Year
of Each Year
1937
$601,537.49
$130,705.61
$ 13,116.37
$ 21,456.27
$ 32,611.50
1938
479,529.95
89,716.87
31,933.54
5,251.56
59,293.48
1939
447,940.77
75,886.82
(14,459.22)
5,496.21
39,338.05
1940
471,507.59
77,309.11
33,560.85
4,600.68
63,382.52
1941
702,617.01
99,501.49
49,227.85
50,968.44
96,712.60
1942
622,803.31
77,763.19
46,347.92
52,863.56
155,198.93
1943
695,540.98
64,560.75
64,045.63
42,236.24
46,490.80
1944
833,667.41
60,466.90
94,286.78
67,500.00
47,349.59
1945
891,212.03
63,482.86
104,998.58
112,500.00
101,073.77
1946
780,711.02
206,583.24
51,813.76
30,000.00
122,950.50
1947
667,109.79
142,023.54
33,613.35
30,000.00
126,563.85
1948
646,417.09
36,869.21
37,500.00
*114 The assets and liabilities of Lucky Tiger as shown by the balance sheet for December 31, 1946, were as follows: ASSETS
Cash
$119,340.31
Accounts Receivable
32,436.76
Inventories
$ 78,871.67
Municipal Bonds
5,660.00
U.S. Government Bonds
100,000.00
Equipment and Fixtures
8,627.53
Other Assets
600.75
Total
$345,537.02
LIABILITIES
Employee Defense Bonds
$ 49.20
Accounts Payable
40,042.86
Taxes
32,494.46
Capital Stock
150,000.00
Surplus
122,950.50
Total
$345,537.02
As of December 31, 1946, the book value per share of Lucky Tiger stock was $181.97. On Leona's petition the Probate Court of Johnson County, Kansas, on April 18, 1947, set aside to her as spouse, from decedent's estate, under Sections 59-403 and 59-2235, 1945 Supplement to General Statutes of Kansas 1935, the following property: Value at
date of
Description
death
The wearing apparel, family library,
pictures, musical instruments, fur-
niture and household goods, utensils
and implements used in the home
$777.77
Automobile - Lincoln Zephyr Sedan,
1937
500.00
Used tractor and garden tools
750.00 These same items were claimed as deductions *115 from the gross estate in Schedule M of the Federal estate tax return under "support of dependents." In his deficiency notice, the respondent allowed a deduction of $750 for support of dependents, but disallowed the balance of the claimed deduction in the amount of $1,277.77 with the following explanation.. "Household goods, etc., named under Item 1, and automobile claimed under Item 3 as deductions, are disallowed as such property is not allowable as support of dependents." On January 20, 1949, the Commissioner of Internal Revenue issued his notice of deficiency to the Estate of Joseph E. Goar for a deficiency in estate tax in the amount of $111,686.25. On the same date the Commissioner issued his notices of liability to both Leona M. Goar and Clayton E. Goar, Transferees of the Estate of Joseph E. Goar to the extent of $111,686.25, plus interest. The estate is now insolvent. Leona as beneficiary of the estate of the decedent received assets administered in the estate having a value at the time of receipt of $18,740.62; also property includible in the estate of $61,002.12 value. In addition, since decedent's death, Leona has received $706.45 a month under the policies of insurance *116 transferred in trust. The value at the date of decedent's death of her right to receive the periodic payments under the policies was $61,266.44. Clayton as beneficiary of the estate of the decedent received assets administered in the estate having a value at the time of receipt of $16,862.85. In addition he received, after decedent's death, $20.27 a month under the policies of insurance transferred in trust. The value at the date of decedent's death of his right to receive the periodic payments under the policies was $62,868.97. The value of stock in Lucky Tiger Manufacturing Company at the date of decedent's death was $275 a share; and the value at that date of the stock in The Goar Corporation was $2,547.35 a share. Opinion (1) The first issue here raises one of the usual questions in estate tax cases; that of determining whether certain property transferred in trust by the decedent under two written trust agreements is includible in the gross estate of the decedent. The respondent contends that the value of the property should be included in the decedent's estate for three reasons: (a) Because the transfers were made in contemplation of death within the meaning of section 811 (c), Internal Revenue Code *117 , (b) because he retained for his life the right to designate the persons who should enjoy the property and the income therefrom within the meaning of section 811 (c), Internal Revenue Code, or (c) because the value of the insurance policies at the date of decedent's death is includible in his gross estate under section 811 (g), Internal Revenue Code. We will first consider whether the decedent made the transfers in contemplation of death within the meaning of section 811 (c), Internal Revenue Code. Each trust agreement recites that the agreement "is made * * * to make the beneficiary secure against the contingencies of life." In our attempt to determine whether the transfers were actually made to make the beneficiary secure against the contingencies of life, we note the inclusion of more than $88,000 worth of life insurance policies and also 100 shares of corporate stock valued at approximately $189,000. The trust instrument includes a provision that the premiums on each life insurance policy should be paid out of, first, the income derived by the trust estate, and secondly, out of principal, if necessary, and *118 only in case the income from the trust estate was sufficient were there to be any payments made to the beneficiaries during the life of the grantor (sometimes referred to as decedent). The annual premiums due on the policies at the date of transfer amounted to approximately $1,300. With such an amount due on the insurance policies each year and the primary obligation of the trustee of the trust to pay such premiums, we are not convinced by the language contained in the trust instruments that the transfers were made primarily to make the beneficiaries secure against the contingencies of life. See Thomas v. Graham, 158 Fed. (2d) 561. Clayton testified that his father stated he wished to do something for his first granddaughter as one of the reasons for the creation of the trusts. The primary beneficiaries under the trusts were the grantor's wife and son. Had the decedent (grantor of the trusts in question) really desired to do something for his first granddaughter and have her enjoy the beneficial effects of such a gift during his lifetime, provisions for her in the form of an indefeasible remainder interest (so called on petitioner's reply brief) in Clayton's trust, of *119 benefit to her only after her parents' death, was obviously a poor and doubtful way to accomplish the purpose, and not likely to do so. Clayton testified, also, that the general tenor of the decedent's statements as to the motive and purpose in creating these trusts was: "He was rather alarmed about business conditions. The Harris-Goar Company had suffered substantial losses. We had closed 7 of the 10 stores. The country apparently was not coming out of the depression very rapidly. He was a little bit alarmed about things in general, and he believed that he should do something to protect my mother and I, and he wanted to set up some kind of a trust so that in the event of his death we would be protected." (Italics supplied.) We have before us some testimony of business conditions of the Harris-Goar Company during this period but nothing sufficiently definite really to determine the facts. There is some testimony of a $50,000 lease cancellation payment but no indication of when the liability arose or who actually paid it. Clayton testified that the decedent was individually liable on these leases but there is no indication that his individual holdings were in peril of being lost. *120 Decedent was only "a little bit" alarmed about things in general and "rather alarmed" about business conditions, but no evidence shows that business conditions prompted the transfer of a large portion of decedent's property. We are convinced that the protection of wife and son in case of his death is the motive disclosed by the son's testimony as to his father's explanation of his motive and purpose. To the same general effect is testimony of the revenue agent who examined the decedent's income tax returns for the years 1938, 1939, 1940 and 1941 wherein he testified that the decedent told him the reason for the creation of the trusts was to avoid probate court difficulties in case of death. Petitioner on brief contends that the creation of the trusts would not eliminate probate court difficulties but under the evidence the grantor thought he was going to avoid probate court difficulties, which is the pertinent point here. (Italics supplied.) We are convinced from the tenor of the entire testimony, and hold, that the transfers of the property here in question were made in contemplation of death within the meaning of section 811 (c), Internal Revenue Code.
*121 Deciding this part of the case as we have, it becomes unnecessary to consider the respondent's other two contentions in regard to this issue, that is, whether the value of the property should be included in the decedent's estate because the decedent retained for his life the right to designate the persons who should enjoy the property and the income therefrom within the meaning of section 811 (c), Internal Revenue Code, or because the value of the insurance policies at the date of decedent's death was includible in his gross estate under section 811 (g), Internal Revenue Code. (2) We next consider the question of the fair market value at the date of decedent's death of the 100 shares of The Goar Corporation stock transferred in trust on October 30, 1935. Due to the fact that the parties have agreed upon the value of all the assets comprising The Goar Corporation except the stock of the Lucky Tiger Manufacturing Company held by the Goar Corporation, we consider here only the question of the fair market value of the Lucky Tiger Manufacturing Company's stock at the date of the decedent's death. The petitioner contends that the value of *122 this stock at the date of death was not in excess of $200 per share, while the respondent's position is that the value of the stock at that time was $447.31 per share. The Lucky Tiger Manufacturing Company has 1,500 shares of stock outstanding, 500 shares of which are held by The Goar Corporation and 1,000 shares owned by the Harris interests. The stock was not listed and at the time of the hearing of these proceedings, there had never been any sales of this stock. The book value of the stock on December 31, 1946, was $181.97 per share. With the petitioner contending for a value of not in excess of $200 per share, it appears to be conceded that the stock is worth at least more than book value. The respondent strongly urges us to use as a basis for determining the value, the average annual profits and average annual dividends paid by the company during the years 1937 to 1946. The petitioner contends that the years 1942 to 1945, inclusive, should be eliminated because of the war and the fact that about one-half of the products of Lucky Tiger were during that period sold to the "Army Exchange Service and Ship's Stores" without much sales expense; and suggests calculation upon the basis *123 of five-year period for the years 1939, 1940, 1941, 1946 and 1947. We can not agree altogether with either petitioner or respondent. We have not eliminated the war years completely but have considered that they should not be given full effect. Considering all of the facts before us we conclude and hold that the Lucky Tiger stock had on the date of decedent's death a value of $275 a share. We have found as a fact that the value of all the assets of The Goar Corporation except the 500 shares of stock of the Lucky Tiger Manufacturing Company on the date of decedent's death was $583,941.91 and that the liabilities on that date were $84,603.25. There remains for the calculation of the value per share of The Goar Corporation's stock the simple mathematical calculation of adding the fair market value of the 500 shares of the Lucky Tiger Manufacturing Company's stock to the net value of the assets of The Goar Corporation and the dividing by the 250 shares of the Goar stock outstanding. Such calculation results in value of $2,547.35 per share for The Goar Corporation's stock. (3) We next consider whether the respondent erred in disallowing $1,227.77 of the amount of $2,027.77 claimed as *124 a deduction in the Federal estate tax return for support of dependents. The petitioner claims the entire $2,027.77 as a deduction under section 812 (b) (5) of the Internal Revenue Code. The entire amount is the amount set aside by the Probate Court of Johnson County, Kansas, in accordance with sections 59-403 and 59-2235 of the General Statutes of Kansas, 1945 Supplement. Section 812 (b) (5) of the Internal Revenue Code allows deductions for "such amounts * * * reasonably required and actually expended for the support during the settlement of the estate of those dependent upon the decedent as are allowed by the laws of the jurisdiction * * * under which the estate is being administered." It is clear that the statutes provide for an amount to be allowed as a deduction for the support of those depending upon the decedent. We have so held in Allentown National Bank et al., Executors, 37 B.T.A. 750, and Estate of Silas B. Mason, 43 B.T.A. 813. The record in the instant case contains no evidence regarding the amount reasonably required or the amount actually expended for the support of those dependent upon the decedent. *125 The respondent has allowed $750 of the amount claimed and petitioner has not shown that any further amount should be allowed in accordance with the statutes. (4) The remaining question is as to the liability of Leona M. Goar and Clayton E. Goar as transferees of decedent's estate. Each admits some liability as transferee, for it is agreed that Clayton received from decedent's estate assets of $16,862.85, while Leona received assets of the value of $79,742.74. In addition, since decedent's death there has been received, under the insurance policies in the trusts, $706.45 a month by Leona and $20.27 a month by Clayton. The defendants argue in their reply brief, though they do not earlier suggest the point, that the notices of transferee liability were not addressed to them as trustees (each for the other, after decedent's death) but were limited to the personal liability of the addressees as transferees. They specifically disclaim any contention that trustees cannot be liable as transferees. They merely contend that because they were not designated trustees in the notices of liability the transferee liability of the respective trustees is not in issue. We can not agree. The statute, *126 section 827 (b) of the Internal Revenue Code, expressly provides that if the estate tax is not paid "then the * * * trustee * * * who receives or has on the date of decedent's death property included in the gross estate * * * to the extent of the value at the time of the decedent's death, of such property, shall be personally liable for such tax." In our view, the deficiency notice, under the above statute, need not designate the addressee of the notice as trustee. Here each was a beneficiary, and trustee for the other as beneficiary. Having thus received the property, Clayton and Leona were liable as transferees. The petitioners further argue that under section 827 (b) of the Internal Revenue Code a person liable as transferee is one who "receives or has" on the date of decedent's death property included in his gross estate; and that because of the spendthrift provisions in each of the beneficiary clauses in the life insurance policies, prohibiting any alienation or anticipation of the policies, they have at no time received anything more than the amount of the installments accrued since the decedent's death and are not liable for the *127 commuted value at the time of the decedent's death of the installments due under the insurance policies. This argument we consider more ingenious than sound, for under section 827 (b) one who receives or has "property included in the gross estate" is liable for the tax. We have above held that the value of the insurance policies is to be included in the estate. The petitioners have received and have the right to the benefit of such property. No authority is cited, and we know of none, that a transferee receiving such a right is not to be liable for the value thereof. John Hancock Mutual Life Insurance Co. v. Helvering, 128 Fed. (2d) 745, to which reference is made by the petitioners, involved merely a life insurance company, and distinguished a case like this, where the beneficiary under a policy is involved. Here the beneficiary is trustee for another beneficiary under a similar trust. The Hancock case did not involve the present question whether the commuted value of insurance payments not yet received may be considered in determining transferee liability. It is apparent from the facts stated, 42 B.T.A. 815, that the commuted value of policies was there *128 included in transferee liability, for the first monthly check, $119.73, was issued by the insurance company April 17, 1934, the notices of liability issued April 26, 1938, stating the total amount of assessment to be $13,881.43, so that obviously the monthly payments theretofore received were not the values included in estate. We hold that the liability of the petitioners as transferees is based on the commuted value and not merely the amounts actually received. Estate of Mearkle v. Commissioner, 129 Fed. (2d) 386; Commissioner v. Clise, 122 Fed. (2d) 998; Wishard, Jr., Exec. v. United States, 143 Fed. (2d) 704. The question of the value of such rights remains. The only evidence as to values is $124,135.41 from respondent's witness, the petitioner having adduced no such evidence. The petitioner argues that the testimony should be rejected because the witness, it is argued, said he did not take into account the effect of the spendthrift clauses. This is not accurate. The witness gave his values to the rights under the provisions of policies, including the spendthrift clauses. He merely testified that he did not discount his figures by reason *129 of the fact that there was no right to realize presently upon the amounts in question. We see in this no reason to reject the evidence, and find upon the evidence that the value to be included in estate, upon the policies, is $124,135.41. Decisions will be entered under Rule 50.